Per Curiam :
In the case of George J. Grant Construction Company, et al., v. United States, No. 46890, decided this day, the court had under consideration a contract substantially identical with the contract in the instant case, and a number of delays in the completion of the contract, allegedly caused by the Government, which were similar to those involved in the instant case. The two cases were tried on the same theory, and the plaintiffs’ evidence in the two cases had the same inadequacies. We therefore refer to our opinion in the *275 Grant case and, without repetition of the discussion therein contained, dismiss the plaintiff’s petition.
It is so ordered.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of Wisconsin, engaged in construction work, with its principal office at Oshkosh, Wisconsin.
2. On May 6, 1943, plaintiff entered into a contract with defendant for the construction of three hemp mills out of a total of 40 hemp mills constructed for defendant by various contractors in the Middlewestern States: No. 24, near Eipon; No. 5, near Hartford; and No. 7, near DeForest, all in Wisconsin. The contract was entered into on behalf of defendant by the Commodity Credit Corporation, an agent and instrumentality of the Government of the United States, acting for and on behalf of Defense Plant Corporation, a corporation created by the Eeconstruction Finance Corporation, pursuant to Section 5d of the Eeconstruction Finance Corporation Act, as amended, to aid the United States in the National Defense Program. The contract is hereby made a part hereof by reference.
The Commodity Credit Corporation was organized October 17, 1933, pursuant to Executive Order 6340 dated October 16, 1933, under the laws of the State of Delaware, as an agency of the United States. From October 17, 1933, to July 1, 1939, the Commodity Credit Corporation was managed and operated in close affiliation with the Eeconstruction Finance Corporation. On July 1, 1939, the Commodity Credit Corporation was transferred to the United States Department of Agriculture by the President’s Eeorganization Plan 1. Approval of the Commodity Credit Corporation Charter Act on June 29,1948, established the Commodity Credit Corporation, effective July 1, 1948, as an agency and instrumentality of the United States under a permanent Federal charter.
*276 3. For each, mill the contract and specifications provided for furnishing:
* * * all labor and transportation, and, except as stated under “Equipment Furnished by Owner,” all materials and equipment required for the construction, finishing and completion of a hemp mill, including the following buildings: Mill complete with steam engine, hemp machines and power transmissions; two-unit hemp drier; boiler house, complete with boilers, accessories, breeching and foundation for stack; shop; locker and washrooms; straw storage building; bale storage building, including grading room and women’s washroom; office building, and platform scale; also all steam power, heating, ventilating, plumbing, and outside and inside service connections, and all electrical distributing systems ; well and water distribution system, outside drainage, sanitary sewer and sewage disposal system; roads, walks, and paths; and all other work and equipment called for in these specifications and shown on drawings, or necessary to complete the plant in satisfactory manner, ready for operation. * * *
The contract price for the three mills was $299,500. This amount was to be adjusted pursuant to a schedule of unit prices not included in the basic contract price. The following unit prices apply to work not included in the basic price:
^
2. Price per cubic yard of excavation for grading the mill site_____________________________$0. 65
3. Price per ton in place of surface course material for roads--------------------------- 1.10
* * * * *
10. Price per 100 lineal feet for constructing sewage-disposal field___________________$60.00
* * * # *
Article I of the contract, in part, reads as follows:
The work shall be commenced 7 days after date of the contract and shall be completed within 150 calendar days after date of contract. The work is to be carried to completion with the utmost speed. Before commencing work a definite time schedule shall be prepared by the Contractor and the approval of the Agent obtained thereto. The Contractor shall comply with this schedule in carrying out the work. * * *
*277 The above provided that the work should start May 13,1943, and be completed by October 4,1943, since the 150th day was on Sunday.
4. The specifications provide in part as follows:
No surveys of sites are as yet available, but plot plan and grades will be furnished when contracts are let. * * * Typical layout is given in Drawing _No. 1. Bids are asked on the basis of this typical drawing, assuming all buildings at the same elevation. In some cases buildings may be reversed to fit site. Bids on road grading, hauling, well construction and sewerage disposal field construction will be on a unit price basis, as provided in Bidder’s Proposal Form.
The following tabulation indicates approximate amounts of work for which unit prices are requested, but contractor will be paid for work actually performed:
Grading of mill site------------------ 2,500 cu. yds.
Surface course material for roads, etc__ 1,000 tons.
Sewage disposal field----------------- 1,200 lin. ft.
ifc # ifc ❖ *
Article 12 of the General Conditions of the contract specifications provides as follows:
Article 12. Materials furnished by owner or agent
No materials, supplies, equipment, labor, services or any other things required for the performance of the work hereunder are to be furnished by the Owner or Agent, unless the specifications otherwise expressly provide. In case the specifications expressly provide that any materials, supplies, equipment, labor, services or any other things shall be furnished by the Owner or Agent, the Owner or Agent, as the case may be, shall use reasonable efforts to furnish the same when required by the Contractor, but neither the Owner nor the Agent shall be responsible for any delay in the furnishing thereof.
5. The contract specifications further provide:
2. Equipment furnished by owner. — The equipment listed below shall be furnished by the owner, but, with the exception of roof trusses for use in Iowa and Minnesota, shall be hauled to site by contractor. Roof trusses for mills in Iowa and Minnesota shall be delivered at mill site by owner.

*278
Equipment Furnished ty Owner For Typical Mill

Approx.

Wt. per

Item No. per Mill Mill

Roof trusses........................................... Set of 20 28 tons
Boilers with accessories................................ Two 200-HP 40 tons
(¿I some cases 3 — 125 to 150 HP H. R. T. or 1 — 400 to 500 HP water tube boiler will be substituted.)
Engine................................................ One 200-HP 8 tons
Hemp breaks and tow softener......................... 3 units 50 tons
Scutchers______________________________________________ 2 pairs 20 tons
Driers, including heating coils and fans................ 2 units 30 tons
Dust and hurds blowers.............-................ 5 2 tons
Scales and mise....................................... —........... 3 tons
Total Approx. Wt. per Mill Equip. Furnished -
by Owner_____________________________________ ______________ 181 tons
Addendum No. 3 to the contract specifications provides in part:
Page CrI-1, Section 2: Add to list of equipment furnished by Owner: Beater rack and shaker shown adjacent to tow softener in Drawing 202, Sheets 1 and 2, and two balers. All are to be hauled from railroad siding and installed by Contractor. Anchor bolts, but no special foundations will be required. Total estimated weight of above items, about 2yz tons.
A 1,500-lb. capacity Dormant scale for the Bale Storage (Drawing 14) and a 15-ton capacity motor truck scale for installation in front of Office (Drawing 1) will be furnished by Owner, but shall be hauled from railroad siding and installed by contractor in accordance with manufacturer’s directions. Contractor shall furnish suitable 3" wood-decking for the truck-scale platform which will be 34 feet long by 9 feet wide. Weigh-beam of 15-ton scale shall be located inside the Office. Manufacturer will furnish supervision for installation of the motor truck scale.
* ❖ * * *
Addendum No. 5 to the contract specifications provides in part:
GI-1, Section 2: Because of restrictions on deliveries of cold-rolled shafting, all shafting for power transmission will be furnished by Owner.
The above constituted the entire list of materials and equipment which was expressly required by the specifications to be furnished by the owner or its agent. The specifications, paragraph Br-1 relating to roads, provided in part:
Plot plan and grades for each site will be furnished!, * * *.
Article 8 of the General Conditions provided as follows:
*279 Article 8. Shop Drawings
The Contractor and the subcontractors shall furnish 4 sets of all shop drawings, properly identified, required by the specifications or by the Agent. All shop drawings submitted by subcontractors shall be first checked by the Contractor and corrected before being submitted to the Agent. Approval of shop drawings by the Agent shall not relieve the Contractor from responsibility for errors or omissions therein. All such errors or omissions must be made good by the Contractor irrespective of any approval by the Agent.
Article 3 of the General Conditions of the contract specifications authorized the owner to make changes in the work. See finding 26 for the text of this article.
6. War Hemp Industries, Inc., was authorized to act as agent of Commodity Credit Corporation in connection with the construction of these mills. The firm of Mead, Ward and Hunt was appointed by the defendant as its architect-engineer to supervise the execution of the plans, but not the design. However, the firm of Mead, Ward and Hunt performed design work as the need for it arose. It acted under the general direction of War Hemp Industries, Inc.
7. On March 14, 1944, and March 16, 1944, the DeForest mill was accepted subject to completion of piping work and minor changes and subject to the provisions of the contract as amended and contingent upon final settlement of the additions to and deductions from the contract price. On March 16, 1944, the Nipón mill and on March 24, 1944, the Hartford mill were accepted under the same conditions.
On June 15, 1944, the three mills were accepted as completed.
8. The contract contained no provision relating to the assessment of liquidated damages.
Article 6 of the General Conditions provides as follows:
Article 6. Delays and extensions oe time
If the Contractor is delayed in the completion of the work due to acts of the Owner or Agent, acts of other contractors in performing a contract with the Owner, fire, floods, strikes, or other casualties beyond the con *280 trol and without the fault or negligence of the Contractor, the time for completion shall be extended for a period determined by the Agent to be equivalent to the time of such delay. Unless the Contractor notifies the Agent of such delay within forty-eight (48) hours after the delay commences, no extension of time will be granted, provided that extension of time without written request within said period on one or more occasions shall not be deemed a waiver of the provisions of this paragraph.
9. The plaintiff claims that the defendant caused it to be delayed in the performance of the contract work from October 4, 1943, until June 15, 1944, the date on which the work was finally accepted. Each instance as to which the plaintiff says it was delayed by the defendant will be discussed separately.
PLOT PLANS
10. On May 10,1943, E. B. Eodgers, the Chief Engineer of War Hemp Industries, Inc., sent to the plaintiff plot plans for each mill site together with the following letter :
Under separate cover I am sending you two blueprints and two copies of “Instructions to Inspectors on Hemp Mills” for the following mill sites: Eipon, Hartford, and DeForest, Wisconsin.
The topographic map of the hemp mill site contains a tentative sketch of the building layout. This layout is subject to change and revision pending the actual inspection of the site by a representative of your company, the inspector, and some representative from this organization. Actual construction is not to be started until site selection and layout have been approved by this office.
As soon as your company is ready to start operations, will you please notify me and I shall make arrangements to have all parties concerned represented when the actual site is staked out.
By letter of May 14, the plaintiff notified Mr. Eodgers that it was ready to meet with defendant’s representatives to inspect the sites and to decide upon site selections.
On May 17, the plaintiff received the following telegram from Mr. Eodgers:
*281 PROCEED WITH CONSTRUCTION WHEN PLOT PLANS ARE RECEIVED AND BUILDING LOCATIONS ON SITES APPROVED THIS OFFICE.
Oil the same day, Mr. McCrory, Director, Hemp Division, Commodity Credit Corporation, met with representatives of the plaintiff and the architect-engineer, and visited the three sites, and Mr. McCrory approved the building locations at each, subject to any minor changes the architect-engineer might make.
The next day, Mr. Ward, of the firm of Mead, Ward and Hunt, staked off the buildings at Bipon, and because a gas main was found under the location of one proposed building at this site, it was necessary to relocate the entire group of buildings. The relocation of the buildings at Bipon made it necessary for the architect-engineer to prepare a revised plot plan, along with elevations. These were forwarded to the plaintiff by the architect-engineer on May 80 and received on June 1,1943.
The buildings at DeForest were relocated because the proposed location according to the May 10 plot plans was low and did not drain well. The revised plot plans dated June 4, 1943, made necessary by such relocation were received by the plaintiff by June 6,1943.
At Hartford, although the architect-engineer resurveyed the building site, there is no evidence that any delay was occasioned the plaintiff as a result of the resurvey.
Excavations for footings were commenced at Bipon and DeForest on June 10,1943, and at Hartford on June 22,1943.
The considerable lapse of time between the receipt of the plot plans and the commencement of excavations for the footings on the buildings indicates that the plaintiff was not delayed by the failure to receive the plot plans earlier.
BOILER HOUSE GROUP
11. On May 11, 1943, Mr. McCrory wrote to the plaintiff advising that the defendant had purchased three boilers for the DeForest mill and that they would be ready for ship *282 ment within a week. Mr. McCrory requested information as to whether the plaintiff would be ready to receive the boilers. On May 15, the plaintiff replied saying that since they had not received authorization to begin work, they had no men at DeForest to receive the boilers. By this letter, the plaintiff advised McCrory that it must have foundation drawings and detail setting plans for the boilers before setting them.
The excavation required for the foundation for the boilers erected in the boiler house was lower than that for the foundation of the walls of the boiler house. Good practice required the excavation for and pouring of the boiler foundations before excavation for the walls of the boiler house.
The plaintiff made further written requests for boiler setting and foundation plans, and by letter of May 21,1943, was advised that the defendant was unable at that time to furnish them but that as soon as they were available, they would be furnished.
On June 21, the architect-engineer telephoned the plaintiff and advised its officers to stop all concrete work on the boiler houses until revised plans were issued. This was confirmed by letter the following day by both parties.
It was not until a day or two after August 13 that the plaintiff had received all revised plans for the boiler house group at Hartford and DeForest, and a day or two after August 23 for Bipon. During the interim, work progressed on the other buildings of the contract work and some work had been performed on buildings of the boiler house group. The architect-engineer’s inspectors’ reports show that by August 11, 1943, at Hartford, the locker and shop buildings at opposite ends of the boiler house group were 20 percent and 17 percent completed, respectively. At DeForest the inspector’s estimate of completion at this date for the buildings of the boiler house group was 15 percent. At Bipon, the inspector’s report for this date showed the locker building to be 50 percent, the boiler house 7 percent, and the shop building 45 percent complete.
The boiler house was almost completed at Bipon on November 13, and at DeForest a week or two later, and at Hartford two or three weeks after November 13.
*283 BOILER GRATES
12. The boilers for the three mills were furnished by the defendant. The DeForest and Hartford mill boilers were supplied without grates. On September 13,1943, the plaintiff .was requested to furnish grates for DeForest and Hartford and to submit an extra for them. The evidence does not show when they were ordered by the plaintiff, but they were received sometime in early November. It was necessary to install the grates prior to bricking-in the boilers.
TRUSS BRACING
13. The truss bracing for the boiler house roof was designed to strengthen the roof against wind stresses and vibration. Plans and details of the truss bracing were furnished by the architect-engineer within a day or two after September 8, 1943, for all three mills. The evidence does not show whether construction of the boiler house was delayed due to the plaintiff’s not having received the plans and details earlier.
CYCLONE SUPPORT
14. The plans called for a cyclone support on the roof of the boiler house. A cyclone support is a wooden support built on the top of the boiler house, supporting the sheet metal cyclone that funnels the hurds down into the boilers. The hurds are the refuse from hemp, which were forced into the cyclone pneumatically through ducts. Hurds furnished the sole source of fuel for the boilers.
A few days before September 4, 1943, the plaintiff was advised by the architect-engineer that the location of the cyclone supports would be different for each mill, depending upon the type of boilers to be used. On September 4, the plaintiff wrote to the architect-engineer stating that it needed the plans within a few days. On September 9, the plaintiff notified the architect-engineer by letter that it was being seriously delayed due to the failure to receive details and location of cyclone supports on the boiler house. Revised plans showing such details and location of cyclone *284 supports were received by the plaintiff on September 27, 1943. The inspectors’ reports show that the plaintiff was not delayed by this item.
STEAM ENGINE FOUNDATION PLANS
■ 15. The steam engine was built in the mill building and had a large concrete base under it, the excavation for which plaintiff expected to complete with its machinery at the time the foundation excavation was done. This was why plaintiff asked for the foundation plans for the engine on May 15, 1943. The plans for the steam engine were first received May 15, 1943, but plaintiff did not receive the steam engine foundation plans until August 13,1943. At the time plaintiff was furnished the plans for the steam engine foundation, the Commodity Credit Corporation directed plaintiff not to proceed with construction until the steam engines arrived. It was believed by defendant that if the foundations were built according to the original contract plans the anchor bolts put in would not fit the second-hand steam engine when it arrived. On August 17, 1943, plaintiff was advised to proceed according to the original plans, and plaintiff did so by the use of hand excavation.
TRANSMISSION EQUIPMENT
16. The plaintiff was required to furnish transmission equipment. This transmission equipment was located in the mill building and transported the power from the steam engine to the various items of mill machinery, and consisted of overhead pulleys, shafting, belts, and gears. This equipment had to be specially fabricated by the seller. Before the plaintiff could order this equipment, it was necessary for the plaintiff to have drawings from the defendant showing the location of the equipment, description of the units, the make, name, number of pieces, elevations and other details. On May 24, 1943, War Hemp Industries sent the plaintiff the following letter:
We have found it necessary to revise certain of our drawings, particularly the one showing the belting layout, and also the method of driving the hurds conveyor *285 under the scutcher and the one under the breaker, also the apron drive. These revisions are in the nature of a clarification and are not radical revisions of the drawings. We now have complete information on the machines which will be used in the mills and we feel that we are now in a position to complete a shafting and belting layout and the method of driving the various conveyors. These revisions are on the drafting board and as soon as they are ready for release you will be supplied with copies.
Until the new drawings are ready I suggest that you withhold placing orders for belting and other power transmission equipment.
The revised plans were received by the plaintiff by June 28, 1943. On July 21, a further revision of the plans was received by the plaintiff. The plaintiff ordered the items of transmission equipment shortly after July 21. The transmission equipment was received in October or November.
TRANSMISSION FRAMING
17. The transmission framing was composed of timbers bolted to the chord of the roof trusses in the mill building to which the shafting supports in turn were bolted. Because of a change in the size of the lower chord of the roof trusses, furnished by the defendant, from 4x6 inches to 4 x 8 inches, it was necessary to make a slight change in the transmission framing in order that the 2-inch differential was compensated or offset so that it would not change the length of the belting. Information concerning this change was furnished to the plaintiff by the architect-engineer by letter of September 27, 1943, together with a sketch of the changes The evidence does not show any delay as to this item.
BELT TIGHTENER AND IDLER PULLEY
18. Mr. Ward of Mead, Ward and Hunt, the architect-engineer, advised the plaintiff that the type of belt tightener as shown on the contract plans was not satisfactory. On September 13,1943, the architect-engineer approved a different belt tightener. The evidence does not show any delay as to this item.
*286 BREAK DRAG CONVEYOR
19. The break and drag conveyors were furnished by the plaintiff. It was necessary for the plaintiff to have detailed drawings for them from the defendant before ordering from the manufacturer. Apparently the first drawings were received by the plaintiff shortly after June 25, 1943. Revised drawings with very minor changes were received shortly after July 2. A further slight revision was received by the plaintiff on August 27. On November 2, still a further revision in the plans was received, but by this time this item was already finished at both Ripon and DeForest.
The work on this item apparently had not progressed as far at Hartford because the concrete floor in the Hartford mill, including the trench for the break drag conveyor, was not poured until December 1943. The evidence does not show any delay as to this item.
ROOE TRUSSES
20. The plan which the Commodity Credit Corporation sent plaintiff showed a 6-inch lower chord for the roof trusses but according to state laws the chord required for plaintiff’s mills was an 8-inch lower chord. The transmission framing was set on top of this chord or was hung under it as required. The elevations of the shafting were given on the plan as the required elevations. As the chord in plaintiff’s mills was required to be 2 inches higher than the plan showed, if plaintiff had placed the transmission framing on top of the chord as required, it would have raised the shafts 2 inches and added to the lengths of belts shown on the plans. On September 27, 1943, the defendant’s architect-engineer sent plaintiff the necessary revisions by letter so the trusses with an 8-inch chord could be used. These revisions were so minor that it was not necessary to make new drawings showing them.
HURDS AND DUST SYSTEM
21. The dust from the hemp processed through the mill was collected by means of suction induced by fans forcing air pressure through sheet metal ducts. The dust was col *287 lected in an outdoor dust bin. The hurds were the refuse or heavy straw from the hemp. The hurds were forced through ducts to the hurd cyclone located on the top of the boiler house. The hurds were in turn fed through ducts to the boiler and were there burned as fuel. The plaintiff received plans for the hurds and dust system beginning on August 11, 1943. Revisions of such plans were received September 27, November 2, December 6, and December 27, 1943. It is not shown by the evidence to what point the work on the hurds and dust systems had progressed on any of the above dates in order to fairly assess the question of delay as to this item.
roads and sidewalks
22. The plot plans furnished by the Commodity Credit Corporation did not show any sidewalks, nor did the plot plans which Mead, Ward and Hunt sent plaintiff May 30, 1943, show the sidewalk work. The plans which plaintiff received from Mead, Ward and Hunt, dated October 22, 1943, were the first plans that showed the sidewalk work. The unit price for roads and sidewalks that was contained in plaintiff’s original bid for all contract work was based on receiving adequate plot plans in time to complete roads and sidewalks in seasonable weather, not in the winter time. This work was not finished until November 1943.
TRUCK SCALES
23. The truck scales were 15-ton scales furnished by the defendant and were located near the office of the site which is near the entrance. These scales were used to weigh the hemp as it came to the mill. The scale was to be set over a pit, but the original plan did not show the pit. The plaintiff requested scale pit plans from the architect-engineer on July 27,1943. In August the scales arrived on the job along .with a plan of the pit from the scale manufacturer. At about the same time, a plan of the scale pit was received by the plaintiff from the architect-engineer. The plaintiff then had two conflicting plans for the scale pit. Upon inquiry made to the architect-engineer, the plaintiff was instructed to use *288 the plan furnished by the architect-engineer. The plaintiff was unable to excavate for the scale pit until such instructions were received and by that time, its excavating machinery had been moved away from the sites so that it was necessary to accomplish the excavation by hand. The pit for the scales was about 12 x 16 feet to a depth of about 3y2 feet. Although the excavation by hand was slower than by machine, the evidence does not show the difference in time required. It is shown that at Eipon the installation began on September 29 and was completed October 12; at Hartford the installation began on November 26 and was completed December 1; and at DeForest the installation began on September 12 and was completed October 2, 1943.
PINAL INSPECTION
24. On February 22,1944, the plaintiff wrote to the architect-engineer requesting final inspection of the contract work as follows:
Please be advised that we are now ready to have you make final inspection at Eipon. Everything is complete or will be complete by the time you set a date with the exception of the feed water regulators which of course are not here yet.
The heating contractor has a few items to do yet but by the time you set a date for the inspection he will have these done.
_ The pipe covering which has been delaying him arrived today and should be installed tomorrow. We are anxious to have this final inspection as soon as possible so that we can turn the mill over to the War Hemp Industries and get it off our hands.
Thereafter, a representative of the architect-engineer, after inspecting the work, prepared a checklist of work items requiring correction at each mill. The first such list for the Eipon mill was mailed to the plaintiff on March 3 and for the DeForest mill the following day. A checklist relating to the DeForest and Hartford mills was mailed to the plaintiff on March 16. The architect-engineer visited each site about once a week from about March 3 to June 15 until the checklist items had been corrected by the plaintiff and the work finally accepted.
*289 25. The revisions in the plans by the defendant was a cause of delay to the plaintiff in the prosecution of the contract work. It is impossible to determine from the evidence, however, the extent to which the defendant caused the plaintiff to be delayed. The plaintiff’s own superintendent was not able to gauge the extent of delays complained of by the plaintiff. While Mr. Hunt of Mead, Ward and Hunt testified that the lack of sufficient plans for the contractor to proceed in a logical manner was a major cause of delay, he added that the plaintiff’s inability to receive materials because of the priorities system and the plaintiff’s difficulty in the correction of the checklist items also caused considerable delay. There were 64 change orders issued under the contract. These change orders increased the contract amount from a base price of $299,500 plus an estimated cost of $47,645, for work not included in the base price, to a completed total contract price of $414,854.50. A reference to such change orders shows that the change orders added additional work items over and above the original contract, the performance of which required additional time.
26. All of plaintiff’s claims, except the one relating to the steam engine foundations, are based on delays caused by changes or revisions made in the work by the defendant. The plaintiff furnished the defendant estimates of the cost of making the changes which were accepted by the defendant and which were then made the subject of change orders, all of which were accepted by the plaintiff.
Article 3 of the General Conditions of the contract specifications relating to changes provides:
Article 3. Changes
The Owner may, at any time, by a written order, and without notice to the sureties, make changes in the drawings and specifications, omit certain work and require additional work to be performed by the Contractor. If such changes, omissions and additions shall materially affect the amount of the work, or the time required in its performance, or shall increase or decrease the cost of the work to the Contractor, an equitable adjustment shall be made. * * * Notice of any claim for adjustment under this Article must be given in writing to the Owner and the Agent within ten (10) days *290 from the date the change was ordered, provided that the Owner, without thereby waiving this provision, may consider any such claim prior to completion and acceptance of the work. If the parties fail to agree upon the adjustment to be made the dispute shall be determined by arbitration as provided herein, but nothing provided in this Article shall excuse the Contractor from proceeding with the prosecution of the work so changed. If any extra, additional or different work be executed by the Contractor without previous written order given by the Owner, no charge will be allowed.
Article 1 of the General Conditions of the specifications reads in part as follows:
(a) Owner, as used herein, shall mean the Defense Plant Corporation and its duly authorized representatives.
(d) Agent, as used herein, shall mean the Commodity Credit Corporation, acting for and on behalf of the Owner.
* # # #
None of the claims involved here, except those mentioned above, were made until October 19, 1945, more than a year after the work was completed.
Article 31 of the General Conditions of the contract specifications provides:
Article 31. Arbitration
In the_ event of any disagreement arising under this contract it shall be submitted for determination by arbitrators, in which event the arbitrator to be appointed by the party giving the notice of arbitration shall be given in the notice, the arbitrator to be appointed by the other party to the arbitration shall be named within five (5) days of receipt of such notice of arbitration, and an additional arbitrator shall, within five (5) days of the appointment of the second arbitrator, be selected by the two arbitrators theretofore appointed, but if one of said parties shall have failed to appoint an arbitrator the sole arbitrator shall arbitrate the question alone. If two arbitrators shall have been appointed by the respective parties to the arbitration and shall have failed to select an additional arbitrator within the above stated time, the additional arbitrator shall be appointed by *291 the senior judge of the federal court for the district in which the work is being done upon application by either of said parties to the arbitration. The decision of a majority of the arbitrators so appointed, or if either party shall have failed to appoint its arbitrator, the decision of the sole arbitrator shall be final and binding upon both parties. Each party shall pay the cost and expenses of the arbitrator it selects but the cost and expense of the third arbitrator and the remainder of the expenses of the arbitration shall be borne equally between the parties hereof. The arbitrators, or the sole arbitrator, as the case may be, shall give prompt notice in writing to each party of their decision on or before ten (10) days after the submission of such questions to them for their decision.
Neither the plaintiff nor the defendant gave notice of arbitration or appointed an arbitrator to decide the disagreements presented by the claims involved herein or any of them.
CONCLUSION OF LAW
Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law, the plaintiff is not entitled to recover, and the petition is therefore dismissed.
Judgment will be rendered against the plaintiff for the cost of printing the record herein, the amount thereof to be entered by the clerk and collected by him according to law.